IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


GARY LYNN BONNER, individually,    )
                                     )
               Plaintiff,        )
                                     )
v.                                    )
                                   )
                                   )
UNION PACIFIC RAILROAD CO.,    )
and GENERAL MOTORS' ELECTRO-    )
MOTIVE DIVISION (EMD)    )
                                   )
            Defendants.    )
_____   )
                                   )
UNION PACIFIC RAILROAD CO.,    )
                                   )
           Counter Claimant,    )
                                   )     CASE NO.  CV 03-134-S-MHW
v.                                    )
                                   )
GARY LYNN BONNER, individually,    )
                                   )     **MEMORANDUM DECISION**
            Counter Defendant.    )     **AND ORDER**
_____   )
                                   )
UNION PACIFIC RAILROAD CO.,    )
                                     )
           Cross Claimant,    )
                                   )
v.                                    )
                                 )
GENERAL MOTORS CORPORATION,    )
                                   )
           Cross Defendant.    )
_____   )

GENERAL MOTORS CORPORATION,   )
                                                 )
                     Cross Claimant,   )
v.                                         )
                                             )
UNION PACIFIC RAILROAD CO.,   )
                                             )
                  Cross Defendant.   )
_____  )

## <u>INTRODUCTION</u>

Plaintiff Gary Bonner ("Bonner) brings this action *pro se* against Defendants Union Pacific Railroad ("Union Pacific") and General Motors' Electro-Motive Division ("GM-EMD"), alleging violations of the Federal Locomotive Inspection Acts, 49 U.S.C. § 20701 *et seq.*, and the Federal Employers Liability Act, 45 U.S.C. § 51, *et seq.*  In May 27, 2000, Bonner was employed with Union Pacific as the Manager of Train Operations ("MTO") when he allegedly sustained neck, back, and knee[1] injuries while performing train service on a locomotive traveling between Nampa, Idaho and La Grande, Oregon.  (Complaint at ¶ 8.)  For these alleged injuries, Bonner prays for damages in excess of $1,500,000.

Union Pacific filed its Answer and a Counterclaim against Bonner for abuse of process and frivolous conduct in a civil case.  In addition, Union Pacific filed a Cross-Claim against GM-EMD for indemnity.  GM-EMD filed its own Cross-Claim against Counter-Defendant Union Pacific, alleging that it is entitled under common law to indemnification and/or contribution in the event that Bonner collects damages from GM-EMD based on his Complaint.

Currently pending before the Court for its consideration are Defendant General Motors' Electro-motive Division's Motion for Summary Judgment against Bonner's claim in his

---

[1]Bonner has not submitted any evidence that his back is injured.  Thus, the Court will grant partial summary judgment in favor of Union Pacific as to Bonner's alleged back injury.

Complaint and Union Pacific's cross-claim for indemnification[2] (Docket No. 46), filed on February 1, 2005, and Defendant Union Pacific Railroad's Motion for Summary Judgment against Bonner's claim in his Complaint (Docket No. 50), filed on February 3, 2005. In addition, the Court will consider Plaintiff Gary Bonner's Motion to Compel (Docket No. 44), filed on January 24, 2005; and his Motion *in Limine* (Docket No. 64), filed February 18, 2005. No summary judgment motions relating to Union Pacific's claims against Bonner are currently pending before the Court.

On April 27, 2005, the Court conducted a hearing for all parties present. Having reviewed all briefing submitted, as well as other pertinent documents in the Court's file, and having heard oral arguments, the Court makes its ruling as follows.

## I.
## Background.

Bonner has a varied past as an employee with Union Pacific Railroad. He began his employment with the Southern Pacific Railroad Company in September 1968. As the result of several mergers which occurred in the 1970's, Bonner's employer eventually became Union Pacific. During the thirty years that Bonner worked in the railroad industry, his positions ranged from performing the jobs of switchman, brakeman, general yardmaster, operating manager, locomotive engineer, to the senior manager of terminal operations. At the time the alleged injuries that are the subject of this lawsuit occurred, Bonner was working as a the senior manager of terminal operations in Nampa, Idaho.

---

[2] Counsel for Union Pacific and GM-EMD informed the Court telephonically that their cross-claims have been resolved. Although the Court heard oral argument on GM-EMD's summary judgment motion against Union Pacific, the Court will no longer consider this aspect of GM-EMD's Motion.

On May 27, 2000, it is undisputed that Bonner and another colleague, Mr. Al Warner ("Warner"), were called upon by Union Pacific to accompany personnel from Defendant GM-EMD to test locomotive UP 8530, which Bonner had reported defective after several crew members had complained about its "rough ride."  Bonner alleges that during the course of the ten hour trip, while following the instructions of GM-EMD personnel on the train, he sustained injuries to his neck, knee, and back.  Bonner further alleges that despite riding on hundreds of locomotives, he had never experienced such a jarring and rough ride as he experienced on locomotive UP 8530.

After experiencing the purportedly jarring ride and complaining of being sore as a result, Bonner admits that he never reported his alleged injuries to Union Pacific per company policy. Bonner knew he should immediately report any injuries sustained during the course of employment as he had disciplined his subordinates in the past for precisely this type of behavior, i.e. failing to immediately report an on-the-job injury.  Nonetheless, the failure of Bonner to file an injury report is somewhat consistent with his prior conduct in the past.  In 1993, after losing vision in his right eye after working for Union Pacific for thirty-six straight hours at an accident site, Bonner did not file an injury report, but did seek a transfer order out of the operating department.  He later filed a claim for loss of vision and after Union Pacific would not pay benefits, he filed suit against Union Pacific in 1996.

In this instance, Bonner never had the opportunity to seek a transfer order because a month after the incident, the police apprehend him at night with a video camera outside the home of Kelli Alderson, the adult daughter of JoDee Alderson, a secretary who worked with Bonner at

Union Pacific.[3]   Three months after the "rough-ride" on the UP 8530 locomotive, Union Pacific

sent Bonner an official termination letter effective August 31, 2000, citing Bonner's

inappropriate conduct, his unauthorized and improper use of company property and the

materially dishonest statements that Bonner made to the police and Union Pacific supervisors

when asked to explain his behavior. After his misdeeds were discovered, but before he was

officially terminated, Bonner filed a claim for disability based on his de-habilitating emotional

and psychological condition.  Union Pacific initially granted him short-term disability benefits

for his emotional condition, but terminated the benefits a month later along with Bonner's

employment with the company.

Nearly a year later, in March 2001, Bonner filed an application for disability benefits

with the United States Railroad Retirement Board ("RRB") based on the loss of vision in his

right eye, depression, obsessive-compulsive personality disorder, and a panic disorder without

agoraphobia.   Bonner did not mention his neck, knee, or back in his disability application.

While the alleged injuries occurred in 2000, it was not until 2001 that Bonner had an

MRI of his knee.  To support his claim that he in fact had injuries in question, Bonner submitted

an affidavit from his ex-wife, Linda Bonner, who testifies that after Bonner moved back into her

home in November, 2000, he would periodically complain about pain in his neck.  She also

emphasized that Bonner generally avoids going to the doctor and has refused to see a doctor on

other occasions.  (Linda Bonner Aff. ¶ ¶ 3, 6.)  Yet, in spite of his supposed reluctance to see

medical professionals, after allegedly enduring approximately four years of pain, Bonner finally

heeded the suggestions of his ex-wife and daughter and saw a chiropractor about his neck pain.

---

[3]  JoDee Alderson also has another daughter, a sixteen year-old, who resided with her at the time of the incident.  Bonner has vigorously objected to the consideration of any of this evidence relating to his termination from Union Pacific. The Court will address this issue more extensively when discussing Bonner's Motion *in Limine*.

**Memorandum Decision and Order - Page 5**

After filing this lawsuit, Bonner went to see Dr. Curran, an orthopedic surgeon, for his knee on September 22, 2003 (Ex. 15 to Bonner Aff.), and Dr. David L. Swenson, a chiropractor, for his neck pain on April 26, 2004.  Dr. Swenson reported that Bonner suffered from a 739.1 cervical segmental dysfunction and a chronic effect of a cervical strain/sprain, 747.0, as well as a 739.3 lumbar segmental dysfunction.  (Ex. 9(a), Report of Dr. David L. Swenson ("Swenson Report", p. 2.)  In addition, Dr. Michael Djernes' Patient Diagnostic Report of an MRI reads, "Impression: There is a mild eccentric bulging of the annulus of the C3-4 disc toward the left not deforming or displacing the spinal cord or left C4 rootlet."  (Ex. 9(b).)  Dr. Swenson also testified in his deposition that Bonner's neck injury was not inconsistent with a history of acute strain.  Nevertheless, given four years had past since the alleged injuries occurred to the time Bonner sought treatment from Dr. Swenson, Dr. Swenson was unable to directly link Bonner's present neck injury to his allegedly "rough ride" in locomotive UP 8530.  Bonner also went to see a Dr. Andrew Curran for his knee injury.  Dr. Curran reported that the overall alignment of the knee appeared normal and Bonner did not report any pain while moving the knee or kneeling. Bonner has included affidavits from Al Warner and himself that when they finished the trip on UP 8530 on May 27, 2000, they complained of feeling pain.

Bonner seeks compensation for these alleged injuries.  Both Union Pacific and GM-EMD have responded with motions for summary judgment against Bonner.  First, however, the Court will address Bonner's Motion *in limine* against Union Pacific.

## II.
## Motion *In Limine*

As a preliminary matter, Bonner seeks to exclude any evidence relating to the events leading up to his termination at Union Pacific and any other lawsuits or claims for disability that he has filed against Union Pacific.  Union Pacific argues the evidence is material because it

demonstrates that Bonner would not have been employed with Union Pacific, earning wages, regardless of whether he was capacity to work was impaired as a result of his alleged neck and knee injuries.  Union Pacific also seeks to introduce the other lawsuits to demonstrate that Bonner has never before complained of injuries to his neck and knee.

The evidence Union Pacific seeks to introduce and Bonner seeks to exclude involves the incident where Bonner was apprehended by the police on June 27, 2000, outside the home of Kelli Alderson equipped with a video camera and dressed in dark clothing.  Kelli's mother, JoDee Alderson was employed at Union Pacific as Bonner's secretary until July 2000.  Before July 2000, Plaintiff and JoDee Alderson maintained a friendship outside of the work environment.  In June 2000, JoDee Alderson had a minor daughter who was sixteen years old and lived with JoDee Alderson.

On June 27, 2000, Kelli Alderson or her roommate contacted local law enforcement to report a prowler.  Detectives Skoglund and Kingbury of the Nampa City Police Department responded to the call.  The officers found Bonner outside of Kelli Alderson's home with the video camera.  Bonner attempted to flee the scene and a chase ensued, after which the police apprehended Bonner, cited him with disturbing the peace, and seized the video camera.  Bonner lied to the police about his activities that evening, claiming he was working on behalf of Union Pacific and was attempting to discredit a fellow employee who had filed a claim for a mental disability by filming his activities.

After obtaining a search warrant the Nampa City Police viewed the videotape.  The tape contained images of both Ms. Alderson and her minor daughter without clothing and in highly personal situations, taken through the windows of their home.  The date stamp on the video tape begins with a scene dated October 28, 1999 and ends with a scene dated June 7, 2000.  When

Union Pacific supervisors later confronted Bonner about his behavior, he was not entirely forthcoming.  As a result, Union Pacific officially notified Bonner that he was terminated as of August 31, 2000 because of videotape incidents and because he lied to the police and Union Pacific about the extent of his actions.

Before his termination and after the videotape incident, Bonner filed a claim for disability benefits effective July 5, 2000 based on his contention that he suffered from an emotional and/or psychological condition which prevented him from continuing to work and caused him to lose sight in one eye.  His disability benefits were terminated after his "misdeeds" were fully uncovered.  In addition to his disability claim and this lawsuit against Union Pacific, Bonner has filed several lawsuits against Union Pacific since his termination.  Bonner has initiated the following claims against Union Pacific or its employees:

a.  *Bonner v. Union Pacific,* CIV 96-0043-SD-EJL, filed on August 15, 2003.  Bonner's first lawsuit against Union Pacific, which he attempted to re-initiate by filing a petition with the Court, dates back to 1996.  In the original 1996 case, Bonner sued Union Pacific under FELA claiming loss of vision due to job-related stress.  In his Petition to re-open the case, Bonner made no mention of his neck or knee.  This Petition was denied.

b. In the year following his termination, Bonner filed a claim for disability benefits with the United States Railroad Retirement Board in March 2001, claiming a disability due to his loss of eyesight, depression, compulsive personality disorder, and panic disorder without agoraphobia.  (*See* Exhibit J to Union Pacific Railroad Company's Statement of Undisputed Facts in Support of Motion for Summary Judgment.)  Union Pacific points out that Bonner made no mention of injuries to his neck and knee.

     c. *Bonner v. Union Pacific, Hunt and Verhaal,* Civil No. 02-0170-S-MHW, filed on April 15, 2002.  Bonner returned to the United States District Court in April 2002, claiming damages for emotional distress and civil rights violations because he was required to assume additional duties which subjected him to "extreme job-related stress."  He did not claim any injuries to his neck or knee.

     d. *Bonner v. Union Pacific,* Civil No. 02-0169-S-MHW, filed on April 15, 2002.  At the same time that he filed his claim for emotional distress, Bonner filed another lawsuit against Union Pacific, alleging it wrongfully denied him ERISA benefits after it terminated his employment.

     e. *Bonner v. Hardesty*, Idaho Third District Court, Canyon County, CV 2002-4243, filed on May 7, 2002.  In May 2002, Bonner filed a lawsuit in Canyon County against a fellow Union Pacific employee, Chuck Hardesty, alleging defamation arising from Hardesty's conduct of reporting to Union Pacific that the police had caught Bonner outside the home of Kelli Alderson, the daughter of JoDee Alderson.  Bonner made a claim for lost future income, arguing that he was terminated as a result of his fellow employee's report.  Union Pacific asks the Court to infer from Bonner's argument that he was physically capable of continuing to work, but for the employee report.

     f. *Alderson v. Bonner*, Third Judicial Court, Canyon County, CV2001-2852.  In another lawsuit, Bonner became the defendant in an action filed by his former secretary, JoDee Alderson on behalf of her minor daughter, another victim of Bonner's videotaping.  Bonner responded with a counterclaim against JoDee Alderson's minor daughter and JoDee Alderson, alleging defamation and violation of his civil rights.

g.  *Bonner v. Alderson,* CIV02-248-S-LMB, filed on June 6, 2002.  Bonner also filed a separate lawsuit against JoDee Alderson, alleging violation of his civil rights, libel and slander.

Bonner argues any evidence relating to his termination is not relevant because he admits he can no longer work for Union Pacific due to a permanent disability unrelated to his termination and his present injures, thus, he argues the events surrounding his termination do not bear on any issue in this case.  More importantly, Bonner contends Union Pacific is using this evidence to prejudice the Court and to distract from the real issues in the case, i.e. the allegedly defective locomotive.  Bonner also seeks to exclude any evidence relating to the various lawsuits he has filed against Union Pacific because he contends they are prejudicial.  Bonner reiterates that the fact he was terminated cannot absolve Union Pacific from compensating him for injuries he received the day he rode in the locomotive.

Union Pacific claims to rely on this evidence in order to show that Bonner's alleged injuries are faked or exaggerated.  They seek to prove that he had never reported the injuries in any of the numerous lawsuits he has since filed.  Also, the police officers, who apprehended him the night he attempted to film Kelli Alderson, did not notice any neck, back, or knee injuries as Bonner fled from the scene.

There are two aspects to Bonner's Motion *in Limine.*  One, should Bonner's conduct be considered in conjunction with the motions for summary judgment, and secondly, should they be excluded at trial.  The Court will first address whether the events surrounding Bonner's termination should be considered in connection with the pending motions.  Although the Court shares Union Pacific's frustration and skepticism as a result of the facts surrounding Bonner's termination and extensive litigation history, and believes Bonner's present claims are tenuous at best, it cannot find that this evidence is relevant to the legal issues raised by the motions.

**Memorandum Decision and Order - Page 10**

Therefore, for purposes of the summary judgment motions, the Court will grant Bonner's Motion *in limine*.

Whether the evidence should be excluded at trial presents a very different issue.  If this case reaches the trial stage, then the Court will grant Union Pacific wide latitude in introducing evidence relating to the events surrounding Bonner's termination and the subsequent lawsuits he filed against Union Pacific.  This evidence would bear on Bonner's credibility and would be proper for impeachment under the Federal Rules of Evidence.  In addition, this evidence is clearly relevant on the issues raised in Union Pacific's counterclaim against Bonner for abuse of process and frivolous conduct.

### III.
### Motions for Summary Judgment

#### A.  Standard of Review

When reviewing a motion for summary judgment, the proper inquiry is whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (1993).  A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  It is not enough for the [non-moving] party to "rest

on mere allegations of denials of his pleadings." *Id.*  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

"When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id*. at 249-250. "The mere existence of a scintilla of evidence in support of the [defendant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [defendants]." *Id.*

The Ninth Circuit has consistently applied the standard for granting summary judgment. *Musick v. Burke*, 913 F.2d 1390 (9th Cir. 1990); *Pelletier v. Federal Home Loan Bank*, 968 F.2d 865 (9th Cir. 1992); *Bieghler v. Kleppe*, 633 F.2d 531 (9th Cir. 1980).

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th. Cir. 1981).

The Ninth Circuit has recently emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp*., 976 F.2d 497 (9th Cir. 1992).

> In order to withstand a motion for summary judgment, the non-moving party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

**Memorandum Decision and Order - Page 12**

**B. GM-EMD's Motion for Summary Judgment**

**1. Bonner's Claims Against GM-EMD**

Bonner brings this action against GM-EMD, as the manufacturer of the locomotive, under the Federal Employers Liability Act, 45 U.S.C. § 51, *et seq.* and the Federal Locomotive Inspection Acts ("LIA"), formerly known as the Boiler Inspection Act (BIA), 49 U.S.C. § 20701, *et seq.,* 49 CFR 229, *et seq.,* specifically, 49 CFR 229.7, 229.9 and 229.45, and Qualifications, 49 CFR 240.121, based on GM-EMD's alleged negligence in allowing Bonner to ride for ten hours on an unsafe locomotive and failing to warn him about the dangers the locomotive posed.

The FELA is a general negligence statute that allows railroad employees to recover from their employers for employment-related injuries caused by the employer negligence. *Norfolk & Western Railway Co. v. Ayers,* 538 U.S. 135, 139 (2003). The employer's duty is nondelegable under FELA. *Ellison v. Shell Oil Co.,* 882 F.2d 349, 353 (9th Cir. 1989). At the same time, the LIA "imposes upon the carrier and absolute and continuing duty to maintain the locomotive, and all parts and appurtenances thereof, in proper condition, and safe to operate...without unnecessary peril to life and limb." *Lilly v. Grand Trunk Western R. Co.,* 317 U.S. 481, 485 (1943)(citations omitted). The Supreme Court has characterized LIA as an amendment to FELA, "dispens[ing], for the purposes of employees' suits, with the necessity of proving that violations of the safety statutes constitute negligence; and making proof of such violations...effective to show negligence as a matter of law." *Urie v. Thompson*, 337 U.S. 163, 189 (1949). The LIA and other railroad safety statutes, serve the purpose of facilitating the employee's ability to recover under FELA, not restricting it. *Id.*

The LIA applies to manufacturers, but the FELA does not. *See* 49 U.S.C. § 21302 (1994); 49 cfr 229.7(b)(2000). Yet, LIA does not confer any right of action on injured employees. *Id;*

*see also Law v. General Motors Corp.,* 114 F.3d 908, 912 (9th Cir. 1997). Therefore, Bonner

cannot bring a direct action against GM-EMD based on a federal statute because no private

cause of action exists under LIA, and although plaintiffs may use a violation of LIA to establish

negligence *per se* against railroad carriers, a plaintiff may not bring an action against a

manufacturer under FELA. *See, e.g., Law,* 114 F.3d at 912 (9th Cir. 1997).

Given that Bonner has no federal statutory cause of action against GM-EMD, the Court

must decide if Bonner is entitled to bring a common law claim against GM-EMD, or whether all

such claims have been preempted by LIA.  GM-EMD argues that Bonner may not bring a state

common law claim against it because Congress intended to occupy the entire field of locomotive

safety and, therefore, has preempted any remedies available through state law.

### 1. Preemption Doctrine

The Supremacy Clause grants Congress the authority to supersede individual states laws

and regulations with uniform national rules.  *See* U.S. Const. Art VI, cl. 2.  However, principles

of federalism create a strong presumption that federal statutes do not preempt state laws;

especially pertaining to those subjects, e.g. health and safety, "traditionally governed" by the

states.  *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993).  "Thus, preemption will not

lie unless it is the clear and manifest purpose of Congress."  *Id.* (internal citations and quotations

omitted).  Congress expresses its intent through: (1) explicit preemption, (2) field preemption

where the federal law occupies a field, and the state law falls within that field; or (3) conflict

preemption, where there is an actual conflict between state and federal law.  *Cippollone v.*

*Liggest Group, Inc.,* 505 U.S. 504, 516 (1992).

The LIA does not expressly preempt state laws and regulations.  Nevertheless, it is clear

that Congress intended to occupy the field of locomotive safety.  With its original enactment in

1911 as the Boiler Inspection Act, and the later Locomotive Inspection Act amendment,

Congress intended to grant the Secretary of Transportation the authority to promulgate rules

through the Federal Railroad Administration (FRA) that would govern all aspects of locomotive

safety to the exclusion of the states.  *Napier v. Atlantic Coast Line R.R.,* 272 U.S. 605 (1926)*;

see also Law v. General Motors Corp.,* 114 F.3d 908 (9th Cir. 1997); *Oglesby v. Delaware &

Hudson Railway Company,* 180 F.3d 458 (2nd Cir. 1999).  In *Napier*, the Supreme Court declared

Congress intended the federal government to occupy the field of locomotive safety, holding that

the LIA preempts every state law that would manipulate "the design, the construction, and the

material of every part of the locomotive and tender of all appurtenances."  *Id.* at 611.  States

therefore may not enact any legislation that would invade the domain of the federal government

with respect to locomotive safety, and any state law which attempts to do so is preempted.  *Law*,

114 F.3d at 910; *Oglesby*, 180 F.3d at 461.

The Ninth Circuit has held that state "common-law claims fall squarely within this

preempted field." *Law*, 114 F.3d at 910*.*  In *Law,* the court affirmed the district court's decision

dismissing the railroad employees' claims against manufactures of locomotive brakes and

engines for strict liability, negligence, failure to warn, breach of implied warranty, and

intentional infliction of emotion distress based on the allegation that locomotive components

were defectively designed and resulted in employees' hearing loss.  *Id.*  In reaching this

conclusion, the *Law* court noted that "the purpose of tort liability is to induce defendants to

conform their conduct to a standard of care established by the state."  *Id.* (Citations omitted).

According to the *Law* court, a decision to the contrary would undermine the federal

government's efforts to maintain uniformity of railroad operating standards across state lines.

*Id.*  The *Law* court further noted that imposing tort liability on railroad manufacturers, "by

**Memorandum Decision and Order - Page 15**

forcing them to conform to design and construction standards by the states,...would transfer the regulatory locus from the Secretary of Transportation to the state courts–a result the [LIA] was clearly intended to foreclose." *Id.* Applying *Law* to the facts of this case, the preemptive effect of LIA would preclude Bonner from bringing any common law claims against GM-EMD.

Naturally, Bonner argues to the contrary, citing *Engvall v. Soo Line Railroad Company*, 632 N.W.2d 560, 564 (Minn. 2001) in support the proposition that the LIA does *not* preempt all state common law actions. In *Engvall*, the plaintiff sued the railroad company for an alleged injury suffered during the course of his employment. In turn, the railroad filed a third-party complaint against the manufacturer of the locomotive, asserting that the manufacturer was liable for plaintiff's injuries under various state common law claims and that the railroad was entitled to contribution and/or indemnity from the manufacturer under Minnesota law. The manufacturer moved for summary judgment, claiming that the railroad's claims for indemnity were preempted by federal law because Minnesota's common law of contribution requires not just common negligence, but common liability. *Id.* The railroad responded that common liability existed because the plaintiff employee could have brought a state common law action of negligence *per se* based on a violation of the LIA against GM-EMD.

The *Engvall* court agreed, concluding that the plaintiff could sue the locomotive manufacturer based on a violation of the LIA. The court distinguished a series of cases holding that the LIA preempts common law actions against manufacturers, including *Law,* on the basis that all these cases involved claims that a manufacturer was liable based on its failure to meet a standard imposed by the *state* rather than *federal* law. In other words, the court did not believe this series of cases stood for the proposition that *all* state law claims against a locomotive manufacturer are preempted, instead, the court construed this series of cases as holding that only

claims seeking to impose a state law standard of care on a manufacturer (or a railroad) are preempted. *Id.* at 571.

Specifically, the court reasoned that a claim based on a manufacturer's alleged failure to comply with the LIA, rather than one based on a state standard, does not "[undermine] the goal of nationwide uniformity of railroad operating standards, the primary rationale for holding state law claims preempted." *Id.* at 570. Following this line of reasoning, the court denied the manufacturer's motion for summary judgment with respect to the railroad's claim for indemnity, concluding that the field preempted by the LIA does not include state common law actions based on a violation of the LIA.

Applying this reasoning to the case at bar, if Bonner sets forth sufficient evidence raising a genuine issue of material fact supporting a common law action of negligence *per se* against GM-EMD based on a violation of LIA, then GM-EMD would not be entitled to summary judgment. The Court, however, does not find the *Engvall* court's reasoning to be persuasive. If this Court followed *Engvall,* then a plaintiff would need only to word his claim as a violation of the "absolute duty" under LIA "to maintain the locomotive, and all parts and appurtenances thereof, in proper condition, and safe to operate...without unnecessary peril to life and limb." Any common law action for negligence could be construed as a violation of this extremely nebulous standard. To allow such a result would completely undermine Congressional intent as Congress specifically did not provide for a private right of action for a violation of LIA and specifically drafted FELA as only applying to carriers and *not* manufacturers.

Yet, even assuming the Court finds *Engvall's* reasoning persuasive, it still does not save Bonner's claims against GM-EMD from dismissal. Although Count I of Bonner's Complaint expressly alleges GM-EMD violated the 'absolute duty' imposed by LIA to ensure their

**Memorandum Decision and Order - Page 17**

locomotives are safe to operate and failed to provide safe equipment and a safe place to work, in

his brief, Bonner states that his Complaint does not directly attack the "design" and

"construction" of a "part of locomotive."  (*See* Response in Opposition to General Motors

Corporation's Motion for Summary Judgment filed on February 1, 2005 at pp.6 &7 .)  Rather,

Bonner maintains his claim "is more about GM's negligent actions" in allowing him "to ride for

over 184 miles and 10 hours on a known unsafe locomotive, without warning." *Id.*   Bonner

characterizes GM-EMD's conduct as "a deviation from reasonable standards of conduct, coupled

with an extremely harmful state of recklessness and disregard for Bonner's health and safety as

evidenced by GM's understanding of, or a disregard for, the conduct's likely consequences."  *Id.*

Nowhere in this statement is the Court able to discern an argument that GM-EMD

violated the federal standard imposed by LIA.  Nor does Bonner offer any proof that GM-EMD

violated LIA.  Instead, he states a common law claim for negligence, i.e. failure to warn.

Because Bonner only alleges a common law claim for failing to warn, the Court must conclude,

in accordance with overwhelming precedent, that Bonner's claim against GM-EMD, as a state

law claim, is preempted by federal law.  Accordingly, Bonner's claim against GM-EMD must be

dismissed and summary judgment should be entered in favor of GM-EMD.[4]

### B. Union Pacific's Motion for Summary Judgment

### 1. Causation

Union Pacific asks the Court to grant summary judgment in its favor as to Bonner's

claims under the Federal Employers' Liability Act ("FELA").  The continuing viability of

Bonner's claim under FELA primarily rests on his ability to prove that the allegedly rough ride

he endured on May 27, 2000 caused the injuries to his knee and neck of which he now

---

[4] As noted above, the parties have represented that Union Pacific's cross-claim against GM-EMD, as well
as GM-EMD have been resolved.  Accordingly, the Court finds this aspect of the Motion is moot.

**Memorandum Decision and Order - Page 18**

complains.  FELA imposes liability upon common carriers by railroad for the injury or death of

railroad employees that results, in whole or in part, from the railroad's negligence or that of their

employees.  45 U.S.C. § § 51 *et seq.*  While Bonner must prove all the elements of a common

law tort– scope of employment, breach of duty, negligence, causation, and damages– an action

under FELA  possesses many features distinguishing it from an ordinary tort action.  *Contrail v.*

*Gottshall,* 512 U.S. 532 (1994).  The Supreme Court has instructed that FELA requires the

application of a relaxed standard of proof concerning causation. *Ulfik v. Metro-North Commuter*

*Railroad Co.,* 77F.3d 54, 58 (1st Cir. 1996), *citing Rogers v. Missouri Pacific Railroad Co.,* 352

U.S. 500, 506 and *Gallick v. Baltimore & Ohio Railroad,* 372 U.S. 108, 116 (1963).  To create a

question for the jury in a FELA case, a plaintiff must present more than a scintilla of evidence,

but not much more.  To withstand a motion for summary judgment, a plaintiff must only raise a

genuine issue of material fact that "employer negligence played any part, even the slightest, in

producing the injury."  *Ulifik,* 77 F.3d at 58, *quoting Rogers,* 352 U.S. at 506; *see also Gallick,*

372 U.S. at 116 (plaintiff's evidence of causation need only be "plausible" to present to jury).

Even given the low threshold to survive summary judgment on a FELA claim, Union

Pacific disputes whether Bonner has established a causal link between the May 27, 2000 "rough-

ride" and his the knee and neck injuries of which he presently complains.  Specifically, Union

Pacific maintains Bonner must submit medical expert testimony conclusively establishing this

link; otherwise, his claim must be dismissed.

The Ninth Circuit has held that expert medical testimony establishing a causal link must

be presented when drawing a particular conclusion requires specialized knowledge.  *Claar v.*

*Burlington Northern Railroad Co.,* 29 F.3d 499 (9th Cir. 1994).  For example, in *Claar,* the

plaintiffs alleged that they suffered from a variety of ailments stemming from their exposure to

various chemicals while working at defendants' shop.  29 F.3d at 499.  Some of these ailments

included "dyscalculia" (poor arithmetic ability) and "spelling dispraxia" (poor spelling ability).

*Id.* at 502.  The *Claar* court found that the plaintiffs' injuries in this case were not the type where

a juror would be qualified to determine whether the railroad's negligence played a part in

causing the injuries.  *Id.*  Therefore, the Court determined that expert testimony was "necessary

to establish even that small quantum of causation required by FELA."  *Id.*

Other circuits have come to similar conclusions.  In *Moody v. Maine Central Railroad

Co.*, 823 F.2d 693, 695 (1ˢᵗ Cir. 1987), the plaintiff sought to prove that harassment by his

employer caused him emotional distress which led to fatigue and angina attacks.  823 F.2d at

693-694.  The court held that in the absence of expert medical testimony linking the plaintiff's

workplace harassment with his physical injury, no triable issue existed on causation and granted

summary judgment for the railroad, noting that the "plaintiff alleg[ed] a condition...manifested

only by subjective pain and allegedly arising from a series of work related pressures, and not

from any traumatic 'accident' or event that jurors, as a matter of everyday experience, could

causally connect with the injury alleged."  *Id.*

While many injuries require specialized expertise to draw a causal inference from an

alleged 'cause,' many other situations do not require a plaintiff to submit expert testimony to

prove causation.  *See, e.g., Gallick,* 372 U.S. 108 (holding that the jury could properly infer that

the fetid and stagnant pool on the railroad's property attracted the insect which bit the plaintiff

despite the Court of Appeals demand for either direct evidence that the unidentified bug at the

time and place had any connection with the vermin-infested pool or more substantial

circumstantial evidence than had been presented that the pool created conditions which helped to

incubate or furnish an environment for the bug)(internal citations and quotations omitted);

*Lavender v. Kurn*, 327 U.S. 645 (1946)(evidence that it was very dark and that surrounding ground was high and uneven and that area was entirely within control of employer was sufficient to create a jury question whether the conditions constituted an unsafe and dangerous working place and whether conditions contributed in part to the switch tender's death even when other evidence had been presented that plaintiff had been murdered); *Ulfik v. Metro-North Commuter Railroad Co.,* 77F.3d 54, 58 (2nd Cir. 1996) (allowing jury to determine causation based on plaintiff and co-workers' testimony when plaintiff alleged paint fumes caused his dizziness which later caused him to fall down the stairs.)  In the above mentioned cases, the injuries alleged were not so "inchoate" or "esoteric" as to mandate the submission of expert medical testimony.  Rather in each of these cases a specific event resulted in a tangible, *physical* injury. Therefore, a juror could reasonably infer that the specific event caused the specific physical injury without the help of an expert.

The Court finds this case more analogous to this latter line of cases not requiring expert medical testimony.  Here, Bonner alleges a concrete, tangible event which could have resulted in a palpable, physical injury to his neck and knee.  On the issue of causation, Bonner has presented his own testimony that he began noticing a pain in his neck and knee immediately following the ride from Nampa to La Grande and that he continues to experience pain in his neck and knee; the testimony of Al Warner, who recalls experiencing excessively rough riding motions on this same ride and reports that he felt extremely ill and sore after the ride; the testimony of Linda Bonner, who states Bonner complained of neck pain after the rough-ride; and the testimony of his chiropractor, Dr. David Swenson, who states that Bonner's injuries of acute neck sprain are not inconsistent with his reported case history even though Dr. Swenson cannot conclusively link Bonner's neck injury to the alleged rough-ride because of the amount of time that passed from

the date the alleged incident to the date that Bonner actually sought treatment.  Bonner, as well as Linda Bonner, will also testify he has not sustained any other injuries to his neck or knee since that fateful ride on May 27, 2000.

Assuming the truth of Bonner's allegations–that he experienced a particularly "rough-ride" due to Union Pacific's negligence, that he immediately experienced pain after the ride and continues to experience such pain, and that he has not sustained any other injuries to his neck and knee since the May 27, 2000–a juror could reasonably infer that a ten-hour journey on a rough-riding locomotive could result in physical injuries to the neck and knee.[5]  Therefore, the Court cannot find, as a matter of law, that Bonner has failed to prove causation and will deny Union Pacific's motion for summary judgment with respect to causation.

The Court reaches this conclusion with some trepidation and by the slimmest of margins given the amount of time Bonner waited before seeking treatment for the injury.  The Court admonishes Bonner that the jury will be able to consider the amount of time from when the injuries occurred until the time Bonner sought treatment in determining whether Bonner actually suffered injuries as a result of the alleged "rough-ride."  As noted above, the Court will also afford Union Pacific wide latitude in introducing evidence relating to the events surrounding Bonner's termination and other lawsuits Bonner has filed against Union Pacific and others as they relate to Bonner's credibility and motives for bringing this lawsuit.

---

[5]The Court observes that the evidence Bonner has submitted with respect to his knee injury is even shakier than the evidence it has submitted with respect to his neck injury.  Although Bonner went to see Dr. Andrew Curran, complaining of pain in his knee and stating he experienced pain at the time of the rough-ride, his MRI showed only lateral tilting of patella with some chondomelacia.  There was no meniscal tear.  In addition, in his follow-up visits to Dr. Curran, Dr. Curran did not notice any restriction in Bonner's knee movement and Bonner did not report any pain while moving the knee or kneeling. Furthermore, there is evidence of Bonner running away from the police the night of June 27, 2000.

**Memorandum Decision and Order - Page 22**

**2. Loss of Earnings**

Alternatively, Union Pacific requests that the Court grant partial summary judgment on Bonner's claim for lost earnings.  In his Complaint, Bonner prays for damages in the amount of $1, 273, 956 for lost earning capacity, plus interest, inflation, and raises.  Bonner alleges in his Complaint that before the fateful ride, he was "a strong and able-bodied man, without injury to his neck, back and knees."  He further alleges that he "has suffered and sustained special damages in the sum of $1,273, 956 in lost earning capacity, plus interest, inflation and raises."

Given that Bonner was officially terminated in August, 2000, and the alleged injuries occurred in May, 2000, Union Pacific argues that Bonner was no longer eligible to earn railroad wages at Union Pacific.  Union Pacific further argues that even if Bonner had not been terminated as a result of his own illicit activities, Bonner himself admits he could not work as a trainman due to a loss of eyesight, an injury wholly unrelated to those alleged in the present action.  Union Pacific also notes that Bonner has not submitted any evidence from a vocational rehabilitation expert or to any other person who could testify to the purported wage loss in this case.

The Court agrees.  Clearly, Bonner may not submit a claim for past or future wages from Union Pacific because he was terminated for other reasons unrelated to his injuries.  Nor has he submitted any evidence to support his allegation that his neck or knee injuries have prevented him from learning a new profession, which would have allowed him to earn $1, 273, 956.  In fact, Bonner has not come forth with any evidence that supporting a claim for "lost earning capacity" in any amount.  Bonner gives no indication as to how he calculated $1, 273, 956 as the amount he has lost in potential earnings.  Bonner may not simply rely on his own blanket statements that his alleged permanent neck and knee injuries have impaired his ability to pursue

a new profession without testimony from a vocational expert or some other expert witness. Accordingly, the Court will grant Defendant's request for partial summary judgment with respect to Bonner's claim for lost earning capacity. Bonner may still seek damages for his alleged pain and suffering and his "medical" expenses if he presents sufficient evidence at trial.

### IV. Motion to Compel

In addition to his Motion *in limine,* Bonner has filed a Motion to Compel, seeking a court order directing Union Pacific to respond to his Fourth Set of Interrogatories and Request for Production, his Fifth Set of Interrogatories and Request for Production, his Sixth Set of Interrogatories and Request for Production, and his Seventh Set of Interrogatories and Request for Production. Specifically, Bonner requests responses to Interrogatory Numbers 7, 8, 9, and 10 and to Request for Production Numbers 5, 6, 7, 8, 9, 10, 11, and 12. Bonner also asks the Court to sanction Union Pacific and award him $1300.00 for the cost of filing this motion. Union Pacific represents it has served its responses to Bonner and relies upon its objections to individual requests. The Court will deny Bonner's request to the extent that Union Pacific has provided the requested information. However, disputes as to individual discovery requests remain.

Union Pacific argues that Interrogatories 7 and 10 and Request for Production 11 and 12 request information which this Court has already determined to be beyond the scope of relevant information to this case. The Court agrees that Interrogatories 7 and 10 and Request for Production 11 and 12 exceed the scope of relevant information and will deny Bonner's Motion to Compel to the extent he requests information that does not relate to the specific locomotive in question and does not involve injuries similar to his own.

**Memorandum Decision and Order - Page 24**

Union Pacific next argues that Interrogatories 8, 9, 10, 11 and 12 exceed the permissible number of interrogatories, including subparts, allowed under Federal Rule of Civil Procedure 33 and Local Rule 33.1 and they are overly burdensome.  Again the Court agrees and will deny Bonner's Motion to Compel with respect to these requests.  Bonner's request for sanctions against Union Pacific is also denied.

## V.
## Conclusion

In sum, the Court finds that Bonner's claims against GM-EMD are preempted, and, therefore, must be dismissed.  In addition, based on GM-EMD's and Union Pacific's representations to the Court that their respective cross-claims have been resolved, the Court finds that Union Pacific's cross-claim against GM-EMD is moot.

However, the Court cannot find that Bonner has failed to prove causation as a matter of law and will deny Union Pacific's Motion for Summary Judgment against Bonner's claims under FELA.  The Court reminds Bonner that his claims against Union Pacific only survived summary judgment by the a very thin margin.  In addditon to hearing evidence of Bonner's claim against Union Pacific, the jury will also hear testimony in support of Union Pacific's Counterclaim against Bonner.

With respect to the Motion *in limine*, the Court will only grant Bonner's Motion in part. The Court did not find the evidence submitted by Union Pacific relating to Bonner's termination and his subsequent lawsuits against Union Pacific to be relevant to the motions pending before it, and did not consider the evidence when deciding those motions.  Yet, if the case goes to trial, the Court will grant Union Pacific wide latitude to introduce this evidence during the trial proceedings for the purpose of impeaching Bonner's credibility and in support of its counterclaim.

Finally, the Court will deny Bonner's Motion to Compel.  Bonner has both exceeded the number of allotted interrogatories, and has requested information that would be too burdensome for Union Pacific to produce.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)   Defendant General Motors' Electro-motive Division's Motion for Summary Judgment against Bonner's claims (Docket No. 46), filed on February 1, 2005, is GRANTED. GM-EMD's Motion for Summary Judgment against Union Pacific is MOOT.

2)   Defendant Union Pacific Railroad's Motion for Summary Judgment (Docket No. 50), filed on February 3, 2005, is GRANTED IN PART AND DENIED IN PART.

3)   Plaintiff Gary Bonner's Motion to Compel (Docket No. 44), filed on January 24, 2005, is DENIED.

4)   Plaintiff Gary Bonner's Motion *in Limine* (Docket No. 64), filed February 18, 2005, is GRANTED IN PART AND DENIED IN PART.

DATED: July 6, 2005

_____
Honorable Mikel H. Williams
United States Magistrate Judge